JESSE GREEN v. THE STATE.*

(*Jackson*, April Term, 1926.)

Opinion filed, July 13, 1926.

1. CRIMINAL LAW. Murder. Evidence of hostility of another towards deceased.

On trial for murder defendant may introduce evidence of hostile feelings existing between deceased and another; who defendant and his witnesses accuse of the crime; to exclude such evidence, is error. (Post, p. 32.)

Citing and distinguishing: Sawyers v. State, 83 Tenn., 695; Hendley v. State, 22 Tenn., 243; Self v. State, 65 Tenn., 244.

2. SAME. Same. Previous threats. Charge of court. Inadequate. Reversal.

On instructions, where defendant is charged with murder, that threats made by deceased against defendant might be considered on question of reasonable apprehension, and the same are not full enough, even without request for additional instructions, the case will be reversed. (Post, p. 34.)

Citing: Little v. State, 65 Tenn., 493; Good v. State, 69 Tenn., 293; Allen v. State, 13 Tenn., 455; Troxdale v. State, 28 Tenn., 411; Wiggins v. People, — Tenn., —.

Citing and distinguishing: Potter v. State, 85 Tenn., 97; Nelson v. State, 32 Tenn., 261; Phipps v. State, 43 Tenn., 344; Crawford v. State, 44 Tenn., 194; Little v. State, 65 Tenn., 493.

3. SAME. Same. Charge of court. Request for additional instructions.

Without evidence to support, request for additional instructions are properly refused. (Post, p. 41.)

4. SAME. Same. Hypothetical case. Refusal to charge upon.

It is not error to refuse to instruct the jury upon a hypothetical

case, as to what might have occurred, and defendant's rights in such an event. (Post, p. 41-2.)

*Headnotes 1. Homicide, 30 C. J., Section 387; 2. Homicide, 30 C. J., Sections 618, 623; 3. Homicide, 30 C. J., Sections 591, 615, 627.

FROM LAUDERDALE.

Error to the Circuit Court of Lauderdale County.— HON. R. B. BAPTIST, Judge.

CRAIG & DURHAM, for plaintiff in error.

FERRISS C. BAILEY, Assistant Attorney-General, for the State.

MR. KINNEY, Special Justice, delivered the opinion of the Court.

The plaintiff in error, Jesse Green, was convicted in the circuit court of Lauderdale county of the murder of one Andrew Buttram. Green and Dick Dowdy were jointly indicted for murder in the first degree of said Buttram, but on the trial of the cause Dowdy was acquitted, and Green found guilty of murder in the second degree, and his punishment fixed at twenty years in the State penitentiary.

A motion for a new trial was duly made and overruled, and the defendant Green prayed and perfected this appeal.

Buttram was shot and killed near midnight at the home of Lee Butler, near the confluence of the Obion and

Mississippi rivers, where he and defendant Green, Dowdy, and others had attended a dance. The dance had passed off without trouble of any kind, and the deceased had entered his automobile with his wife and others preparatory to returning home, when, for some reason, he got out and went back of the house next to the Obion river, where defendant Green, Dowdy, and Cheek, and Lee Butler were. Green, Dowdy, and Cheek were waiting there for the return of one of their party from a store nearby, to get in a motor boat to return up the Obion river to their homes. It was at this point the trouble and shooting began. There is a serious conflict in the evidence as to how and why it began. The State contends that it grew out of a wrestle between Buttram and Dowdy, that Green and Buttram wrestled first, at the request of Buttram, and that Buttram threw Green, and then that Dowdy and Buttram wrestled twice, Buttram throwing Dowdy each time, and that they got up after the last fall and shook hands, and that Dowdy stepped back and began shooting.

The defendant contends that Buttram had hostile feelings towards him, and that Buttram, when he came where he and the others were sitting, as above stated, jumped on him without notice or warning, and that, when he finally got loose from Buttram, Buttram stepped back a few steps, ran his hand inside the breast of his overalls and said, "I am going to kill every damn son of a bitch one of you," and that defendant claims that knowing that Buttram carried a pistol in his bosom, he drew his pistol and began shooting, that Dowdy did not shoot at all, and that no wrestling at all was done.

The State also contends that Buttram turned and ran under or around the house towards his automobile after the first few shots were fired by Dowdy, and that then Green pursued and shot at Buttram as he ran and until he fell and then shot him several times after he fell.

The contention of the defense is that Green did the first shooting, and shot four or five times, exhausting all the cartridges in his pistol, and that he neither pursued nor shot any more, and that it was Lee Butler, at whose house and by whom the dance was given, who shot at deceased as he ran towards his automobile; that Lee Butler had hostile feelings towards deceased, because deceased attended his dances and sold liquor in competition with him. There was evidence tending to show that Lee Butler was at or near the end of the house around or under which deceased ran, and one witness testified positively that he saw Lee Butler shoot at deceased three or four times as he ran. There is also evidence tending to show that Lee Butler had a lantern in his hand, and that after the deceased fell he broke this lantern in pieces against a tree, which was about twelve or fourteen feet from where deceased fell and about twenty feet from where pistol cartridges were found on that side of the house where deceased fell. It was also shown that Lee Butler was very much frightened on the night the defendants were arrested and put in jail, and that he requested that he be locked up in jail for the night, which was done. He disappeared a few days after the killing, and his habitation is unknown.

These are the contentions of the State and of the defense, and each is supported by some evidence.

The home of Lee Butler was an old boat, placed upon posts or pillars high enough from the ground for a man to walk under it. At this point the Obion river runs in a westerly direction and the Mississippi river in a southerly direction. The house faced the Mississippi river with the side of the house or the long way next to the Obion river and about twelve or fourteen feet from that river. Between the house and the river, the bank was sloping and was a landing place for boats. The house, including the back porch, was about fifty-four feet long. The shooting began on the north side of the house and between it and the Obion river. Deceased ran and fell on the south side of the house. Lee Butler had occupied this house for about two years. He had been giving dances on Saturday nights, and the evidence tends to show that he had no visible means of support.

The defendant Green was an assistant or employee of Robert Whitwell, a prohibition enforcement officer. They had made several whisky raids. When property had been taken it was left in the custody and care of Green. The pistol which Green had and shot at deceased had been given to him by Whitwell to use in guarding and protecting property taken in whisky raids. There was evidence tending to show that one raid had been made in the neighborhood of where deceased resided; that deceased had threatened that if they raided him he would kill both of them, that if defendant came for his outfit he would leave him in the woods. There was evidence tending to show also that all the shots entered from the front of deceased.

It is not necessary that we should review all the testimony in this case, in view of the conclusions we have

reached, and we express no opinion on the facts further than we deem necessary on ruling on the assignments of errors hereinbelow disposed of.

It is also unnecessary that we pass upon all the assignments of errors. Those we consider most important are as follows:

## XIV.

The fourteenth assignment of error is as follows:

"The court erred in excluding the testimony of defendant Green, defendant Dowdy, and witness Cheek, to the effect that Lee Butler entertained hostile feelings against the deceased Buttram because of their disagreement over their illicit sale of liquor there on the premises of said Lee Butler, and in overruling defendant's thirteenth ground of his motion for a new trial to that effect."

The bill of exceptions as to this testimony is as follows:

"Q. Do you know what the feelings between Lee Butler and Andrew Buttram was; where that was good or bad? A. Not for sure, I don't.

"Q. Well, do you know anything Andrew Buttram or Lee Butler either told you? A. He (Lee Butler) told me he didn't like him on account of—

"MR. STEELE (interrupting): We object to it.

"MR. CRAIG: Don't state that.

"MR. STEELE: What Lee Butler told him (Green) wouldn't be competent at all.

"THE COURT: No; certainly not. That is excluded to which defendant excepted.

"The witness answered out of the hearing of the jury that Lee Butler expressed hostile feelings against But-

tram because Buttram had brought his liquor up to But-
ler's dance hall to sell in competition with Butler. This
same testimony was offered by the witness Dowdy and
witness Cheek and excluded by the court, to which de-
fendants excepted.''

The defendant also prepared a special charge and re-
quested the court to charge same as to this matter, which
the court refused to do, and this is also assigned as an
error. That part of the special request covering this
phase of the case is as follows:

''The defendant has introduced proof tending to
show that there was bad feeling between the deceased,
Buttram, and one Lee Butler, and that Lee Butler was
the one who followed him around the house shooting at
him. The defendant insists that Lee Butler was influ-
enced by causes producing a motive for him to shoot But-
tram, and that he did have such motive, and that he did
do the shooting after the deceased ran. If you find these
to be the facts, or have a reasonable doubt as to whether
it occurred that way, you should not convict the defend-
ant Green.''

In the case of *Sawyers* v. *State*, 15 Lea, 695, the court
held, viz: ''It is a rule of law that the guilt of the ac-
cused must be made out to the exclusion of every other
reasonable hypothesis. If there is proof in the posses-
sion of the accused tending to show that another had the
motive, or was in condition to be acted upon by causes
which might produce the motive to commit the offense,
such facts may be shown as items of proof tending to
establish a motive in the breast of such other person,
and to that extent prove the existence of an hypothesis
inconsistent with the guilt of the prisoner, the value of

such evidence to be determined by the jury, who should give to it any such weight as its surroundings may justify.''

Green, Dowdy, and Lonnie Cheek claimed to be in a position where they could see and hear what was done and was said when the shooting was done. They testified that Green did not shoot after Buttram turned and ran; that there were other shots fired after Buttram ran and towards the rear end of the house towards which he ran; that Lee Butler was at or near the end of the house. There was also evidence tending to show that two and different pistols were fired. Dowdy testified that he saw Lee Butler shoot at deceased three or four times. Lee Butler had a lantern, and for some reason he broke it to pieces on the side of a tree and on the south side of the house after Buttram fell, showing that he was on that side of the house about the time Buttram fell. He also, for some reason, went to the jailor and got permission to be locked up and stay in the jail. He appeared to be very much frightened the night the defendants were arrested. He left the county in a day or two, and, so far as the record discloses, is still away, and his habitation unknown. The evidence excluded tended to show he had hostile feelings towards Buttram.

In the reply brief for the State, it is said: ''The State does not insist that Lee Butler had nothing to do with this affair, as it is entirely possible, having the lantern as described by the State's witnesses so that deceased might be a better target for defendant who was pursuing the deceased, and, while Lee Butler is not introduced as a witness, and as heretofore stated his whereabouts unknown, it might be that, realizing his part in this trag-

edy, he purposely absented himself from the community, and the fact that he did absent himself does not indicate in any way that this defendant was not the man who fired the shots after the deceased had fallen to the ground.''

There is positive evidence in the record that Lee Butler shot at the deceased several times after he turned and ran towards his automobile, and also positive evidence that the defendant Green did not shoot again after deceased ran, and did not pusue him.

Viewing the testimony in the light of the holdings above quoted, we are of the opinion that said testimony excluded by the court should have been submitted to the jury, as tending to establish a motive in the breast of Lee Butler for shooting the deceased.

In the case of *Hensley* v. *State,* 9 Humph., at page 243, the defendant was indicted for arson. She pleaded not guilty, and on the trial offered to prove that one John Richards had threatened to burn the mill, and was in the neighborhood when it was burned. The attorney-general objected to this proof, and the objection was sustained by the trial judge, to which the defendant excepted. The supreme court, in reviewing the matter, said:

''We think the testimony offered was legitimate proof and ought to have been heard by the jury. Surely it was a legitimate defense for the prisoner to show that another and not herself perpetrated the crime with which she was accused, and any proof would be legitimate to establish this fact, which would have been legal against the individual upon whom it is attempted to place it, if he had been upon trial therefor. It will not be controverted that if John Richards had been upon trial for

burning the mill, that proof that he had threatened to do so, and that he was in the neighborhood the night it was burned, would be legal proof of his guilt to be submitted to the jury.''

So if Lee Butler had been upon trial for the murder of Andrew Buttram, evidence of his ''hostile feelings'' against Buttram and his reasons for such hostile feelings against Buttram, would, as we think, be legal evidence of his guilt to be submitted to the jury.

In the case of *Self* v. *State,* 6 Baxt., 244, the defendant was on trial as an accessory before the fact to the murder of Jas. G. Mason by Geo. Simpson. The principal, Geo. Simpson, was not on trial, but had been killed in an attempt to arrest him a few days after he murdered Mason. On the trial of this case, the State offered evidence of threats by Simpson to kill Mason, made before the killing, to which the defendant objected, but the objection was overruled, and the evidence admitted to go to the jury, and, in reviewing same, the supreme court said:

''We are therefore of opinion that the threats made by Simpson were properly admitted as evidence, and that they were competent as well to establish the guilt of the principal as to fix the grade of the homicide.''

The fourteenth assignment of error is therefore sustained.

## XI.

The eleventh assignment of error is as follows:

''The court erred in failing to charge the jury, in substance:

" 'In this case the court has permitted to be introduced evidence of threats alleged to have been uttered by the deceased towards the defendant Green. No threats howsoever violent would justify the defendant Green assaulting or slaying the deceased, but, if you find such threats were uttered by the deceased towards the defendant, this evidence may be looked to by the jury as tending to show the state of mind of the defendant Green, and to illustrate his motives and conduct, in connection with all the other facts and circumstances in the case, and also as tending to show the *animus* of the deceased, and to illustrate his conduct and motives,'

—and in overruling the tenth ground of defendant's motion for a new trial to that effect.''

Defendant was an assistant prohibition officer, and he and one Whitwell, his employer, were making raids for those engaged in the violation of the prohibition laws. Deceased had made threats that, if Green and Whitwell made a raid on him, he would kill both of them. He had also threatened that, if Green came for his outfit, he would leave Green in the woods. These threats had been communicated to Green. Green established a good character for peace and quiet. The twelfth assignment of error goes to these facts and is otherwise of a kindred nature to the eleventh, and for that reason these two assignments will be considered together. This twelfth assignment of error is as follows:

''The court erred in failing to charge the jury that they could look to the proof as to the good character as to peace and quietude of the defendant Green and the threats made by the deceased to the defendant Green as circumstances making it probable that deceased might have made

the attack on the defendant Green and produced a state of the case that would reduce the killing to manslaughter, and further that they might look to same in determining the existence of malice and provocation, and the degree of the crime, and in overruling the eleventh ground of defendant's motion for a new trial to that effect.''

In the case of *Potter* v. *State,* 85 Tenn., 97, 1 S. W., 617, this court held as follows: ''It is assigned as error that under these facts the court failed to instruct the jury that the threats of deceased, communicated and uncommunicated, might be looked to by them, the former as tending to show the state of mind of the defendant, the apprehension under which he was acting, and to illustrate his conduct and motive, in connection with other facts and circumstances in the case; and the latter, as tending to show the *animus* of the deceased, and illustrate his conduct and motives (*Little* v. *State,* 6 Baxt., 493), and that the evidence does not sustain the verdict. . . .

''It is the duty of the circuit judge to charge the law applicable to the evidence, and give the defendant the benefit ([*Good* v. *State*] 1 Lea, 293) of it, and not to decide for himself the case he supposes to be made out, and apply the law to such suppositious case and leave to the jury only that for decision, and to us to speculate on its effect and the possible injury or want of injury done defendant. In this case it can be clearly seen that the omission to charge the law is as vital an error as it would have been to have charged it incorrectly, and we hold that defendant was entitled to have it given without demand.''

In *Nelson* v. *State,* 2 Swan, 261, the court held: ''As there was no human eye looking upon this transaction, and none but the accused could know the circumstances

attending it, the jury would have to judge from the facts proved whether the case was manslaughter or murder. They could have no difficulty, under the proof in this case, as to the fact of killing, but whether it was done upon malice or passion, so as to make a case of manslaughter or murder, that is, whether the facts proved were sufficient to remove the legal presumption of malice arising from the act of slaying, and the weapon used, and the former threats, would constitute their only difficulty. To come to a conclusion on this question, they would have to carefully weigh the concomitant facts, such as the commencement of the quarrel by the deceased that day, the remark of the prisoner that he had nothing against him, the relative size and strength of each, the appearance of the ground on which they fought evidencing mutual combat, the condition of the clothes and person of Nelson and the deceased, tending to show the same. They would also look to the state of Sam's feeling towards Nelson, as indicated on that day and previously, as circumstances making it probable that he might have made the attack and produced a state of the case that would reduce the killing to manslaughter.

"We think the charge of the court ought to have been more full and explicit on these points, in a case of life and death, where everything must depend upon the weight and bearing of circumstances and the strength of presumptions. It is true in general, upon a failure to charge fully where there is no essential point omitted or wrongly charged, it is necessary that it should appear that the party asked for further instructions, and the court refused to give them, but in this case we regard the omission as too important to the life of a human being, to

place it upon that ground. We do not say that it would have produced a different result, but it is enough that it might have done so."

In the syllabus in *Phipps* v. *State,* 3 Cold., 344, the court held: "In civil causes, upon the failure of the circuit judge to charge the law fully, no essential point being omitted, or wrongfully stated, it is necessary, to put the court in error, that further instructions were asked by the party, and the court refused to give them. But this doctrine has not been strictly applied in cases involving human life."

In *Crawford* v. *State,* 4 Cold., 194, the court held: "It is not enough, in criminal cases involving the life and liberty of the accused, that the law of the case be partially stated. The accused is entitled, in such cases, to such a charge as the facts of the case require, and nothing short of that will satisfy the demands of justice. *Allen* v. *The State,* 5 Yer., 453-456; *Nelson* v. *State,* 2 Swan, 482; [*Troxdale* v. *State*] 9 Hum., 411."

The able trial judge, in his charge to the jury said: "If any animosity existed on the part of the deceased to the defendant, as indicated by words or actions, then or before, it is proper matter for the consideration of the jury on the question of reasonable apprehension."

We are of the opinion that this part of the charge is not full enough. It should also have instructed the jury that it was proper matter for their consideration in determining the state of mind of the deceased and to illustrate his conduct and motives.

In *Little* v. *State,* 6 Baxt., 493, the court held: "But in all cases where the acts of the deceased in reference to the fatal meeting are of a doubtful character, then

evidence which may tend to show that he sought the meeting or began or provoked the combat is admissible. And, in this view, previous threats made by the deceased, though not communicated to the prisoner, may yet tend to show the *animus* of the deceased, and to illustrate his conduct and motives, and in some cases might be important, in the absence of more direct evidence, to show which party began or provoked the fight.''

In a footnote to said case is a quotation from Central Law Journal as follows:

''Upon principle, the rule announced in *Wiggins* v. *People* (U. S. supreme court), seems the only true and correct one. The deceased is not 'a mere third person,' but a party, and the motives that impel him to action are as much the subject of inquiry as those of the defendant. With the view of discovering the motives that move defendant, the prosecution may go back beyond the region of the *res gestae* and prove threats. It has been said that the 'volume of human nature is the same throughout ten thousand editions,' and it is an universal axiom that all men act from like motives. If the threat of the defendant will indicate his state of mind and action, it will also indicate the mind and action of the deceased. The question of the guilt of the defendant involves an examination of, not only what he did, but also what the deceased did. If threats will aid the investigation of what the defendant did, in the language of the supreme court of Indiana, 'we cannot see any good reason why the threats of the deceased against the defendant are not also competent evidence.' ''

There is evidence in the record tending to show that the deceased went to the defendant where he was sitting

on the bank of the river, and jumped on him without no-
tice or warning, and there is also evidence tending to
show that the trouble was the result of the contest in
wrestling. The evidence of these threats was also cal-
culated to throw some light upon the question as to which
party began the fight.

There was no special request presented for a fuller
charge on this evidence as to threats made by deceased
against the defendant, but under the holdings, above
quoted from, we are of the opinion that the charge should
have been fuller, even without such special request, and
was to that extent erroneous as given.

The court did charge as to the good character of the
defendant, and we think it is correct.

### OTHER ERRORS ASSIGNED ON THE CHARGE.

It is also contended for defendant as errors that the
court failed to give the defendant the benefit of a charge
that he had the right to continue shooting at deceased
after he turned and ran and fell on the ground, if he
believed upon reasonable grounds that his life was still
in danger and that deceased was not retreating from the
fight but would immediately renew it, and that the im-
minent danger still existed, and also that the defendant
would not be guilty of murder in the second degree if
he shot at deceased while he was running away from him
and after he fell on the ground, if the shots thus fired
were the result of passion or heat of blood roused upon
a sudden fight, which had then not had time to cool.

The charge of the court did not cover either of these
contentions of the defendant, but two special requests

were submitted on the former of these two assignments, which were refused by the court.

We are of the opinion that no error was committed by the court as to either of these two assignments, because there was no evidence to support either of them. The defendant denied that he shot at deceased at all after he turned and ran.

For the reasons hereinabove stated, the case is reversed and remanded for further proceedings.