**STATE of Tennessee, Appellee,**

v.

**Stephen Michael WEST, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

Feb. 6, 1989.
Rehearing Denied March 27, 1989.

See also 728 S.W.2d 32.

Thomas K. McAlexander, Jackson, for appellant.

W.J. Michael Cody, Atty. Gen., James W. Milam, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

FONES, Justice.

A jury in Union County found defendant guilty of first degree premeditated murder of Wanda Romines and her daughter Sheila Romines, aggravated kidnapping of Wanda and Sheila Romines and aggravated rape of Sheila Romines. At the sentencing hearing the jury found three aggravating circumstances applicable to both victims, to-wit: the murders were especially heinous, atrocious or cruel; they were committed to avoid arrest or prosecution; and they were committed while the defendant engaged in committing first degree murder, rape or kidnapping. *See* subsections 5, 6 and 7 of T.C.A. § 39–2–203(i). Defendant was sentenced to death for each murder and to forty years imprisonment on each of the three convictions for rape and kidnapping.

These brutal murders were committed by defendant West and Ronnie Martin at the Romines' home in the Big Ridge community of Union County, between 6:00 a.m. and 8:30 a.m. on 17 March 1986. Defendant and Martin both worked at McDonald's in

Lake City, Tennessee. Defendant was twenty-three years of age and Martin was seventeen years of age at the time of the murders. Defendant was Martin's supervisor at McDonald's. They had known each other only about two weeks when they embarked upon an episode of drinking and roaming around the countryside in the car of Martin's mother.

Defendant testified that Martin told him he knew a girl who would give them some sex. It appears that defendant had no prior acquaintance with anyone in the Romines family but Martin was known to the mother and daughter.[1] They lay in wait in the vicinity of the Romines' house until Jack Romines, husband and father of the victims, left the house to go to work about 5:20 a.m. Defendant testified that they knocked on the door, Mrs. Romines admitted them, and Martin introduced him to the mother and daughter and announced that he wanted to borrow some money.

After his arrest defendant made at least five statements about what occurred in the Romines' house after they were admitted. In his first statements he insisted that he and Martin had left the house together after some sexual activity, and that both mother and daughter were unharmed; that when they got to the car Martin decided to return and get some money from them; that Martin was gone approximately thirty minutes; and that when Martin returned to the car, they drove away. In mid-afternoon on 18 March after his mother had visited him, he made another statement wherein he said that he had seen part of a video taped interview of Martin, who was putting all the blame on him. He then proceeded to put all the blame on Martin.

In his statement of 18 March and later statements, and at trial, he admitted that he was present when the murders occurred but denied that he participated to any extent whatever in inflicting bodily harm upon either victim. He testified that Martin had a pistol and two knives and threatened his life numerous times while they

were in the Romines' house if he did not obey Martins' orders; Martin directed Sheila to "give him head". He then forced her to engage in sexual intercourse on top of defendant while Martin entered her anally.

The last statement defendant gave was at his request. It began at 11:52 a.m. and terminated at 1:31 p.m. when a retained lawyer arrived. That statement contained much detail that defendant had never mentioned before. A portion of the new material was that after killing Mrs. Romines in one bedroom Martin and defendant went into Sheila's bedroom where Martin handed defendant one of the knives and said "I killed the mother and now you kill Sheila"; that defendant refused and threw the knife down on the floor. The statement continued as follows:

> The co-worker [Martin], still armed with a gun, got down on his knees, and Sheila started begging to him and asking him why. Co-worker's reply was, "I owe you, I owe you." Co-worker was giggling as he said that co-worker would ease the knife in and would work the handle back and forth trying to hurt her. This went on for a while. . . .

Defendant was six foot, one inches tall, weighed one hundred seventy pounds, and had served three years in the military. Martin was five foot, ten inches tall and weighed one hundred forty pounds. Defendant related events that occurred after the initial sexual activity wherein he and one of the victims were in one of the bedrooms or the living room and Martin and the other victim were in another room. It is patently obvious that defendant could have gained the upper hand over Martin and brought the tragic events to a halt if he had been so inclined. As an alternative, he could have easily escaped to a neighbor's house for help if he was really as cowardly as represented. Those opportunities continued to occur after it became apparent, by defendant's own admissions, that Martin intended to kill both women. Defendant was asked on direct examination

---

1. The trials of West and Martin were severed. West was tried first and Martin did not testify at West's trial.

why he did not try to stop Martin. His response was "I couldn't do nothing". Later on he said that he was incapable of doing what Martin did, and that he "couldn't even clean a fish".

Jack Romines testified that he kept a thirty-eight caliber unloaded pistol in the drawer of a chest in Sheila's bedroom and that it was missing on the afternoon of the murders, along with an envelope containing more than $200 in cash. Investigating officers found a thirty-eight caliber unloaded pistol in a storm drain in Norris, Tennessee, that was identified as the one belonging to Jack Romines. The information that led to the recovery of the gun came from John Allen, who was a friend of Martin's. There was testimony that at about 4:00 a.m. Martin had stopped at John Allen's house and gone in and obtained a butcher knife from Allen. Defendant disclaimed any knowledge that Martin had a butcher knife when they entered the Romines' house.

As an additional excuse for his alleged cowardice in not preventing the murders, defendant said in his later statements and at trial that Martin had threatened to have a friend kill his wife. However, defendant related that threat as occurring the first time when they left the Romines' house by the back door after both victims had been murdered. Martin allegedly directed defendant to get the car and pick up Martin on the other side of a wooded area. It was then that Martin supposedly threatened that if defendant tried anything "smart," Martin would make a phone call and defendant would find his wife and child dead when he got home. Defendant's wife was pregnant with their first child at the time.

Dr. Cleland Blake, a forensic pathologist, testified that Sheila had been stabbed seventeen times in the abdomen. Fourteen of the stab wounds were described as torture type cuts. She had three fatal wounds through the chest wall into the heart to a depth of five and one-half inches. Dr. Blake said that those wounds were inflicted by knives at least that long. It was his opinion that the torture wounds to the abdomen were inflicted prior to the fatal

wounds to the heart based upon the manner in which the blood drained. Some of the torture wounds to the abdomen penetrated the liver and the mesentery and there was considerable bleeding from those wounds into the abdominal cavity. Dr. Blake said blood would not have been pumped into the abdominal cavity if the heart had stopped pumping, which it did in less than a minute after the fatal heart wounds. Sheila also had two defensive type wounds, one on her left forearm and one on her left thumb. Dr. Blake was of the opinion that Sheila had sustained great pain and suffering from the various stab wounds in the abdomen, particularly those going into the liver.

Dr. Blake testified that Wanda Romines had suffered a number of deep stab wounds. One caused the right lung to collapse, while others cut into the colon, the liver, the gall bladder, etc. The fatal wound completely severed the right common iliac artery, the large artery that takes blood under pressure down to the right leg. That wound caused massive hemorrhaging into the abdominal cavity. Death followed within five to ten minutes according to Dr. Blake. She also had torture type wounds.

Dr. Blake visited the crime scene and examined the bodies and later performed an autopsy on each victim. Based upon the width, depth and pattern of the wounds inflicted upon Sheila he concluded two different knives were used and that some of the wounds were inflicted while she was on the bed in her bedroom and some were inflicted while she lay on the floor beside the bed where she was found. Dr. Blake testified that "my conclusion is that two people were involved in the infliction of the wounds as well as participating in keeping these two women separated until they were probably brought to the end of their lives with these horrible stab wounds."

The only witness, other than the defendant, called by the defense during the guilt or innocence phase of the trial was Dr. John Evans, a general pathologist, who had performed "at least five hundred autopsies." He testified that he had reviewed Dr. Blake's autopsy report on both victims

and that he saw no basis for Dr. Blake's conclusion that the victims had been stabbed by two individuals. He acknowledged on cross examination that Dr. Blake was a well qualified, board certified forensic pathologist, but was somewhat equivocal with regard to whether Dr. Blake, who had seen the bodies at the crime scene, examined the wounds there and performed the autopsies, was in a better position than he was to reach that conclusion.

Defendant's testimony at trial included some details that had not appeared in any of his pre-trial statements. He claimed, for the first time, that Martin had cocked the pistol and put it right between his eyes and said, "I ought to just kill you, and he was laughing." He said this occurred after Martin had stabbed Sheila one time. He also claimed that he saw a man standing on the road near Martin's car as he left the house, that he wanted to tell the man what had happened, but that he "kept seeing Karen [his wife] like that poor girl was." Defendant worked his regular shift at McDonald's the day of the murder and did not tell anyone what had happened at the Romines' house.

Several neighbors of the Romines positively identified the blue vehicle that the State proved Martin and West were using as being parked in the neighborhood from approximately 6:00 a.m. to 8:30 a.m. on 17 March 1986. Mr. Hicks, a neighbor, testified that he looked out his front door and saw a car stuck at the end of his driveway. He went outside and found that two men had taken down a fence post in his yard to use in getting the car out of the ditch. They eventually got the car out of the ditch and drove away from that point. He identified defendant as one of the men in the car. His wife identified the car the men were in as the same one the State proved Martin and West were using on 17 March. The investigating officers found that the telephone wires at the Romines house had been pulled out of the wall.

At the sentencing hearing, three persons who had known defendant for three, twelve and fourteen years respectively, testified that he was a good person and they did not

know anything bad about his past. His sister testified that he was the baby in the family and had never been in trouble, and that his mother could not come to court because she had had a heart attack. Defendant's wife testified that they had an eleven month old daughter, and that she loved defendant and he loved her. Defendant testified and again denied that he had participated in the murders of the two victims. He denied any prior criminal record and said that he was an honor student in school and had never had any disciplinary problems.

Defendant contends that the trial judge erred in overruling his motion to suppress the five statements given by defendant to law enforcement officers. Defendant asserts that he was never advised of his *Miranda* rights and that there was no knowing and intelligent waiver of those rights.

Officer Breeding testified that he advised defendant of his *Miranda* rights promptly after he was arrested and one or more of the officers involved in the taking of each of the five statements testified that preceding the taking of each statement defendant was informed of the rights mandated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In addition to advising defendant of his rights on 19 March, prior to taking the fifth statement, Agent Scott had defendant sign a written waiver. Defendant testified that none of the warnings were given and although he admitted that his signature was on the waiver dated 19 March 1986, at 11:52 a.m., defendant denied that it was signed at that time and under those circumstances.

The proof was that defendant was arrested at his home about 8:30 a.m. on 18 March 1986, and transported to jail. That morning he was interrogated by Officer Breeding and T.B.I. Agents Pressnell and Scott. Later he was shown a portion of Martin's videotaped statement implicating defendant. Around 3:00 p.m. that day, after members of his family had been permitted to visit him, he requested to speak to one of the agents and after giving a statement

to Pressnell in the presence of his mother, Agent Scott interviewed him.

Defendant testified at the suppression hearing that he was taken before a magistrate that evening. Around 5:00 a.m. on the morning of 19 March, Agent Scott sought to interrogate him again but defendant refused to sign a waiver. However, around noon defendant sent word that he wished to speak to Agent Scott. That was arranged and according to Agent Scott, defendant signed the T.B.I. form of *Miranda* rights, followed by a waiver, before the interrogation began. Agent Scott wrote out a lengthy rendition of what defendant said at that time, but defendant's lawyer arrived before the interview was completed and all interrogation ceased at that point, and defendant did not sign the statement.

Defendant contends that the failure of the officers to attempt to obtain a written waiver prior to 5:00 a.m. on 19 March, and defendant's rejection at that time "tend to preponderate against the trial court's finding that *Miranda* warnings were given at all stages of the interrogation."

■ The statements that defendant sought to suppress were acknowledged to have been written by the interrogating officer, either Pressnell or Scott, and did not purport to be other than the officers' rendition of the oral information defendant had given at that particular interview. The date and time of each interview was noted on the statements. Defendant did not deny that he was interviewed at the times recorded in the statements and his disagreements with the accuracy of the contents were trivial and of the type to be expected when one person writes an essentially narrative account of what another person has said. In defendant's trial testimony, he admitted that he was not telling the truth in the first statements and insisted that he was telling the truth in the later statements wherein he said that Martin continuously had all three of the other occupants under his complete dominion and control, with an unloaded pistol and knives. In connection with a subsequent issue, counsel for defendant affirmatively asserts that

"other than his initial statements ... all of the defendant's statements given subsequently to the offense were extremely consistent."

Defendant also asserts that even if he was given *Miranda* warnings on all five occasions, and executed the waiver prior to the fifth statement, he did not voluntarily, knowingly and intelligently waive his rights. Defendant testified that he was denied solid food and refused permission to use the restroom facilities. On cross examination defendant's implication was that his access to the restroom was merely delayed by Pressnell and Scott when he was being interviewed. Sheriff Lloyd testified that defendant was offered food at every meal but that he refused any solid food, taking only liquids "because he just didn't have the stomach to eat." Sheriff Lloyd denied that defendant was refused use of restroom facilities.

The trial judge resolved the credibility issues against defendant. In this Court, defendant has the burden of showing that the evidence preponderates against the ruling of the trial judge. *See State v. O'Guinn*, 709 S.W.2d 561, 565–66 (Tenn. 1986). We find that there was ample evidence to support the trial judge's ruling.

Defendant complains of a number of incidents of alleged prosecutorial misconduct. The factors that we consider in reviewing the alleged misconduct are those adopted in *State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984).

■ Defendant says the district attorney attempted to inflame the passions and prejudices of the jurors in the opening statement by a detailed description of the murders and the agony and terror suffered by the victims as well as by Jack Romines, the husband and father, upon discovery of the bodies. Defendant also contends that it was improper for the prosecution to tell the jury that defendant had lied to his wife and to the investigating officers. Defendant admitted on the witness stand that he lied to his wife and to the investigating officers and we find that the prosecutor's opening statement was within permissible limits of the proof presented.

■ Next defendant says the trial judge erred in refusing to accept defendant's offer to stipulate as to the identity of all property taken from the Romines' residence at the time of the murders. That offer was made by defendant in an effort to eliminate the testimony of Jack Romines which defendant says was anticipated to be highly emotional and prejudicial to defendant. We rejected a similar contention in *State v. Morris*, 641 S.W.2d 883 (Tenn. 1982) for the reason that the State is entitled to prove all of the relevant circumstances in such manner as it sees fit, within the rules of evidence. "Stipulations are a matter of mutual agreement and not a matter of right by one party or the other in an adversary proceeding." *Id.* at 889. Mr. Romines' testimony was particularly relevant with respect to where he kept the money that was stolen, where he kept the pistol, that it was unloaded, his identification of the pistol and the location and description of the other guns that he kept in the house.

■ Defendant says the prosecution conducted an improper cross examination of defendant wherein he was accused of giving ten different versions of what happened, and badgered about differences between the statements and his direct testimony, and about why he didn't report the killings and why he left his pregnant wife alone that night. Defendant also continues to complain of several prosecution questions that defense counsel objected to, the objections promptly sustained by the trial judge. The cross examination of defendant was vigorous and on several occasions the district attorney badgered the witness by approaching too close to the witness chair and by, according to defendant's brief, his tone of voice which the record does not confirm. But so far as the record shows, each time defendant objected to such activities the trial judge sustained the objection and several times ordered the district attorney to return to his place at the counsel table. The district attorney improperly asked defendant if he denied seeing the video wherein Martin accused him of committing the murders, but the trial judge promptly sustained defendant's objection.

However, the jury already knew that Martin had accused defendant of the murders because it was in defendant's third statement, implicitly offered by defendant as one of the reasons why he was changing his story.

We have carefully examined the record relevant to the numerous other alleged instances of improper cross examination and we find that no prejudicial error occurred during the cross examination of defendant.

Finally, defendant contends that prosecutorial misconduct occurred during the district attorney's closing argument. Defendant says it was improper to call defendant a liar; to make comments implying that defense counsel was misleading the jury; to imply that defendant and Martin were under the influence of drugs as well as alcohol at the time of the murders; to state that Jack Romines was a necessary witness; and to state that defendant was guilty of character assassination in making the statement that Sheila Romines had consented to have sex with him. Defendant also charged that the prosecutor told the jury that a neighbor right across the road was caring for her elderly mother, had a telephone and was "ready to come to the aid of the Romines family", and complains of several other instances wherein defendant says the prosecutor argued matters not supported by the evidence.

In *State v. Beasley*, 536 S.W.2d 328 (Tenn.1976), we held that a prosecutor's argument should be supported by evidence introduced at trial and the reasonable inferences to be drawn from that evidence and that a lawyer's personal opinion as to the credibility of witnesses should not be injected into argument. However, we cited with approval a number of cases wherein remarks of counsel in argument making reference to "lying" defendants or defense witnesses were allowed, if based upon evidence in the record. *Id.* at 330.

■ There were a few instances when the district attorney's remarks were not supported by any direct evidence, such as the comment that he didn't "know whether Mr. West or Mr. Martin, or both, had taken

anything other than alcohol." However, the manager of the McDonald's where defendant worked testified that on 17 March, the day of the murders, defendant acted strange, told her he did not feel well and at one time acted like he "was having flashback from an acid trip". That evidence, together with the grossly inhuman brutality inflicted upon the victims, can be said to give rise to an inference that a substance more potent in deadening human consciousness than beer was used.

▮ There were other instances where the district attorney's remarks had borderline support through reasonable inference to be drawn from evidence and a few that were not based upon evidence or proper inferences therefrom. It was improper for the district attorney to tell the jury that defense counsel was "trying to throw sand in the eyes of the jury" and "blowing smoke in the face of the jury." However, viewed in the context in which the improper remarks occurred and in light of the overwhelming evidence of defendant's guilt the instances of prosecutorial misconduct were harmless beyond a reasonable doubt.

Defendant contends that the trial judge erred in excluding testimony of Libby Woods that Martin allegedly had threatened to kill Sheila Romines on several occasions and in excluding a tape recording of Steve Hunley, a cellmate of Martin's, wherein Hunley said that Martin allegedly admitted that he committed both murders. The trial judge excluded both offers of proof on the ground that such testimony was inadmissible hearsay.

Defendant contends that the testimony of Libby Woods was admissible under this Court's holdings in *Green v. State*, 154 Tenn. 26, 285 S.W. 554 (1926) and *Hensley v. State*, 28 Tenn. 243 (1848), wherein threats made against victims by a person, other than the defendant, who was not on trial and who was in a better position to commit the crime, were held admissible. In *Hensley*, proof that a third person had threatened to burn the mill defendant was charged with burning was held admissible when such proof "would have been legal against the individual upon whom it is at-

tempted to place it if he had been upon trial therefor," and it was a "legitimate defense for the prisoner to shew that another and not herself perpetrated the crime." *Id.* at 245. The State distinguishes this case from *Hensley* and *Green* by noting that here the hearsay testimony would be attributed to a co-defendant so that any such proof would be cumulative where the State concedes the co-defendant's guilt and where the proof would not prove the defendant's innocence.

Similar reasoning was followed by this Court in *Sible v. State*, 50 Tenn. 137 (1871) as one ground for distinguishing *Hensley*. There the declarations were made by a person jointly indicted with defendant who could not have been examined as a witness by either party if he had been personally present in court. Under those circumstances allowing such testimony "would hold out temptation, and afford facilities for simulating such defense." *Id.* at 139.

Defendant insists that the Hunley tape was admissible on two grounds: first, refusal to admit the recording deprives him of due process under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed. 2d 297 (1973); and second, it was a declaration against penal interest.

In *Chambers*, defendant was charged with murdering a policeman. McDonald had given a sworn statement acknowledging that he had killed the policeman but repudiated that confession one month later at his preliminary hearing, where he was charged with the murder. McDonald was present at Chambers' trial and when the state did not call him as a witness, Chambers moved the court to be allowed to call him as an adverse witness, which motion was denied because of the voucher rule. Nevertheless, Chambers put McDonald on as his witness and introduced the sworn statement that McDonald had made confessing to the murder. On cross examination, the state elicited from McDonald his repudiation of the confession at his preliminary hearing, the promises made to him to induce the confession, and what he was doing during the episode that resulted in the murder of the policeman. Chambers

again sought to cross examine McDonald as an adverse witness, which was denied. He then sought to introduce three witnesses to whom McDonald had allegedly confessed, under circumstances that the United States Supreme Court found "provided considerable assurance of their reliability". *Id.*, 93 S.Ct. at 1048. The trial judge excluded the testimony of the three proffered witnesses. The United States Supreme Court concluded that Chambers had been denied a fair trial by the Mississippi Court's application of the hearsay rule totally excluding statements against penal interest and the voucher rule to prevent Chambers from having the benefit of the testimony of the three witnesses and the cross examination of McDonald.

A strong factual circumstance that clearly influenced the court in reaching that conclusion was the finding that "[t]o the extent that McDonald's sworn confession tended to incriminate him, it tended also to exculpate Chambers". *Id.* at 1047. That was because the evidence made it clear that only one person was responsible for the shooting death of the policeman.

 In the instant case, the guilt of Martin does not exonerate defendant, who was present, participating, aiding and abetting and his defense that his participation was commanded at gun point by Martin would not have been corroborated by the excluded evidence. Also, in *Chambers*, the declarant, McDonald, was available for cross examination, whereas Martin, the declarant here, was unavailable to the State or the defendant as he would have unquestionably invoked the privilege against self-incrimination.

Finally, there is the question of corroboration and reliability. The so-called Hunley tape was a conversation between Martin and Hunley, a prison inmate, and was recorded by some other unidentified person in the prison, without Martin's knowledge. This record is completely silent as to any corroboration whatever of the alleged statements of Martin on the Hunley tape. In *Smith v. State*, 587 S.W.2d 659 (Tenn. 1979) we held that "hearsay declarations against penal interests made by an unavailable declarant, to be admissible, must be proven trustworthy by independent corroborative evidence that bespeaks reliability." *Id.* at 661. After analyzing *Chambers* extensively in *Smith*, this Court noted as follows:

"The contention that *Chambers* requires the admission of uncorroborated hearsay statements against penal interest has no validity, and has been rejected by many courts, federal and state." *See Commonwealth v. Carr, supra.*[2]

No error occurred in excluding the testimony of Libby Woods or the alleged Hunley tape.

Defendant asserts the trial court erred in failing to give the jury a limiting instruction that they could only consider defendant's prior inconsistent statements for purposes of impeachment, not as substantive evidence.

 Defendant did not request a limiting instruction and did not raise this issue in his motion for a new trial. Defendant relies upon *State v. Reece*, 637 S.W.2d 858 (Tenn.1982). In *Reece* the prior inconsistent statements were extremely damaging and the State's case against defendant was weak. Thus the failure to give the limiting instruction was fundamental error even in the absence of a special request. In the instant case, the error was neither fundamental nor prejudicial, and was waived.

Defendant relies on *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) for the contention that defendant cannot be subjected to the death penalty because the proof failed to show that defendant directly participated in the murder.

We interpret those cases and *Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986) as requiring that a defendant who did not actually commit the murder may not be given a death sentence unless shown to be a major participant therein, that his mental state was one of

---

2. *Commonwealth v. Carr*, 373 Mass. 617, 369 N.E.2d 970 (1977).

reckless indifference to human life and that a reliable determination be made by the state courts that those factors have been met.

▪ It is beyond question that defendant was a major participant in the underlying felonies of rape and kidnapping and was present throughout the rather substantial time period during which the numerous stabbings of the two victims took place. Defendant's claim that he was an unwilling participant and was himself under threat of harm by Martin was rejected by the jury and we find it totally unworthy of belief. By defendant's own admission, he had accompanied Martin for many hours while they drank to excess and planned to get some sex. Defendant offered no explanation as to why he failed to try to get away, call for help, or attempt to overpower or get the drop on Martin, even though by his own description of the activities of the four persons in the house he was obviously presented with the opportunity to do each and all of those things that could have prevented the two murders. He failed to report the murders after he was free of any possibility of harm from Martin, and his claim that Martin's threats of harm to his wife prevented him from doing so is likewise unworthy of belief. Defendant had given numerous substantially different versions of what took place at the Romines house pre-trial, and yet another version at trial. He was found to be without credibility by the jury and the trial judge, and properly so. There was no corroboration whatever for his trial version that he was an unwilling participant in the killings and the known circumstances before and after the murders render that version incredible.

We find defendant was a major participant in the felonies of rape, kidnapping and murder and that his mental state was one of reckless indifference to the value of human life.

▪ Defendant contends that the trial judge erred in overruling his objection to a portion of the district attorney's rebuttal argument that defendant labels a misstatement of the law and an unconstitutional shifting of the burden of proof. Defen-

dant has erroneously labelled the argument. The district attorney merely argued that the evidence at the scene of the crime indicated that more than one person was a participant and that unless defendant's explanation created a reasonable doubt he should be convicted. The evidence supported that argument. When the trial judge overruled defendant's objection he reminded the jury that it was argument, correctly charged the jury that the mere presence of a person at the scene of a crime does not make such person an aider or abettor and correctly charged the burden of proof. Defendant waived this issue by not including it in his motion for new trial, but considered on its merit, it is without substance.

▪ Defendant asserts that the trial judge erred in not granting a mistrial because of a question the district attorney asked defendant on cross examination at the sentencing hearing. First the prosecutor asked defendant if it was not true that "just before this happened," his wife was about to leave him, which he denied. Defendant was then asked "isn't it true that she is still afraid that you will get out someday?". Defendant objected at that point and the trial judge promptly sustained the objection. After completion of the district attorney's cross examination, defendant moved for a mistrial, which the trial judge denied, but he expressly instructed the jury to "disregard the question and any inference to be drawn from the question." The question was improper, but the action taken by the trial judge cured the error and he did not abuse his discretion in denying a mistrial. *See State v. Compton*, 642 S.W.2d 745 (Tenn.Crim. App.1982).

Defendant says the trial judge erred in overruling his motion for a change of venue. He contends the publicity at the time of the offense, defendant's arrest and again as the trial time approached was intense, sensational and inflammatory; that many of the prospective jurors indicated they had heard about the case through the media or friends or neighbors; that the trial judge rehabilitated many of

those jurors; and that defendant was required to use peremptory challenges to remove them from the jury panel. Defendant's brief fails to identify the jurors he contends were rehabilitated or were challenged peremptorily when they should have been excused for cause.

The victims were murdered on 17 March 1986, and the trial began on 16 March 1987. Defendant introduced into the record seven articles that appeared in the *Knoxville News Sentinel* between 18 March 1986 and 19 September 1986, eight articles that appeared in the *Knoxville Journal* between 18 March 1986 and 1 July 1986, six articles carried by the *Clinton Courier* between 20 March 1986 and 5 June 1986, two articles from the *Appalachian Observer* and one from *The Town Crier*, a Lake City paper. Defendant's brief does not specify what he considers inflammatory. We have read the articles and are of the opinion that they may be accurately labelled as routine reporting of a crime involving the rape, kidnapping and murder by multiple stabbings of a mother and daughter in their home between 6:00 a.m. and 8:00 a.m. The headlines were not sensational, but the body of several of the articles noted that the stabbings were unusually brutal. Defendant's own lawyer was quoted in an article as saying that the stabbings "may have been some sort of Satanic, cult worship act". That was the closest approach to sensationalism that we observed in the articles.

■ Our reading of the voir dire reveals that the questioning about any bias or prejudice based upon publicity or community comment was carefully explored and the trial judge's participation was clarifying rather than rehabilitative. We find that the trial judge correctly denied defendant's motion to change venue. *See State v. Melson*, 638 S.W.2d 342 (Tenn.1982) and *State v. Hoover*, 594 S.W.2d 743 (Tenn. Crim.App.1979).

■ Defendant attempts to make another issue out of the Hunley tape that allegedly contained Martin's conversation with Hunley incriminating himself and exculpating defendant. The trial judge ruled that defendant could introduce the Hunley tape at the sentencing hearing, a ruling in accord with *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). However, the trial judge also ruled that if defendant introduced the tape, the State could introduce the recordings of Martin's statements to the investigating officers wherein he incriminated defendant. Faced with that ruling, defendant made the decision not to introduce the Hunley tape and now attempts to label the trial judge's ruling as "effectively suppressing the tape," which he asserts to be reversible error. It would be a violation of fundamental fairness to permit defendant to introduce a hearsay statement favorable to him and preclude the State from introducing directly contradictory statements from the same declarant, neither party being able to cross examine the declarant. This Court will not countenance such basic unfairness and we find no merit to this issue.

Defendant contends that the district attorney's closing argument at the sentencing phase of the trial impermissibly minimized or shifted elsewhere the responsibility of the jury with respect to the death sentence, in violation of the principles announced in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

During closing argument at the sentencing phase, the district attorney made the following statements:

The decision you are going to be called upon to make obviously is very serious, it is one of the most serious you will ever make. But, on the other hand, if you will listen to what the Judge tells you the law is, you will see that it is not necessarily a difficult decision in that sense. In the application of the law. Because the law provides certain guidelines, certain perimeters within which you are to consider the verdict, your secondary verdict in this case. And basically that rests with a decision of fact. The weighing of fact, the discerning of what side proofwise outweighs the other.

See, the law in Tennessee, and the law of the land, in this sense, is self-executing, in the sense that the law mandates,

require a death sentence in certain situations, unless it is outweighed by other factors.

The law is clear. Your responsibility once again is to weigh proof, to make a finding of fact, apply the applicable law to those facts and <u>the law provides the punishment, not you, not you. You do not set punishment in this case, per se. You make decisions based upon fact and the law, self-executing, based upon your weighing the facts.</u>

The district attorney then discussed the aggravating factors shown by the proof and the jury's role in weighing aggravating and mitigating factors under the statute. He then concluded:

As the law states, and the Judge will tell you this, once the State proves aggravating circumstances, one or more, beyond a reasonable doubt, if they are not outweighed by mitigating circumstances the defendant shows you, the punishment shall be death. That is a matter of law. It is a matter of law.

I am not going to stand here and tell you that that is an easy application of the law, because it is not. It is a difficult application. <u>But, just keep in mind, you don't impose the sentence, the law provides the sentence, you are merely finders of fact.</u>

Defendant expressly complains of the portions underlined above.

Defendant asserts that this portion of the State's argument violates the holding in *Caldwell v. Mississippi, supra,* that it is constitutionally impermissible to rest a death sentence on a determination by a sentencer who has been led to believe that the responsibility for determining the appropriateness of a defendant's death rests elsewhere. In *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the Court commented that its holding in *Caldwell* is relevant to those comments "that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Id.,* 106 S.Ct. at 2473, n. 15.

The concerns voiced in *Caldwell* are triggered when a jury is misled as to its role in the capital sentencing scheme. The two steps in reviewing an alleged *Caldwell* violation are determining (1) whether the prosecutor's comments to the jury were such that they would "minimize the jury's sense of responsibility for determining the appropriateness of death" and (2) whether the trial judge in the case sufficiently corrected the impression left by the prosecutor. *Mann v. Dugger,* 844 F.2d 1446, 1456 (11th Cir.1988).

██ We agree that the district attorney's statements that "the law is self-executing", that the law "provides the punishment, not you", and the concluding statement that "you don't impose the sentence, the law provides the sentence, you are merely finders of fact", violate *Caldwell.* Such statements minimize the jury's role and allows them to feel that the responsibility for a death sentence rests elsewhere.

██ We must determine whether the trial judge sufficiently corrected the impression left by the prosecutor. The trial judge responded to defendant's objection by reminding the jury that the court "was the proper source from which you get the law", and that statements concerning the law should not be "considered authoritative when presented by argument of counsel". The trial judge correctly instructed the jury with respect to their responsibility in determining the death penalty. Other portions of the State's argument and the defendant's argument correctly set forth the responsibility of the jury, in accord with Tennessee's capital sentencing procedure. We are of the opinion that the three or four brief erroneous characterizations of the jury's role in determining the appropriateness of a death sentence were sufficiently corrected by the trial judge and the accurate portions of the district attorney's and the defendant's arguments stressing the proper responsibility of the jury. These clarifying measures contrast sharply with the situation in *Caldwell v. Mississippi, supra* where the trial judge endorsed the prosecutor's remarks. Thus we find that

the errors were harmless beyond a reasonable doubt.

Defendant contends the trial judge erred in denying his motion to authorize the hiring of a psychologist at State expense to testify as to the viability of defendant's duress defense to the rape charge.

Prior to that motion, defendant had sought and the court had authorized an investigator, a statistician, and a seriologist, all at State expense. Also, the trial judge ordered a mental evaluation of defendant, *sua sponte*. Defendant was opposed to the mental evaluation and pursued an interlocutory appeal to the Court of Criminal Appeals where the trial judge's order was reversed on the ground that the undisputed medical evidence found the evaluation unnecessary. It was subsequent to the Court of Criminal Appeals' ruling that defendant sought the services of a psychologist and defendant asserts in this Court that the trial judge denied his request because defendant had successfully appealed the mental evaluation order.

■ We find it unnecessary and inappropriate to comment on this speculative motivation because the trial judge's ruling was correct. The issue of whether defendant was forced to have sexual intercourse with Sheila Romines under threat of death or injury from a deadly weapon employed by Martin was a pure fact issue upon which no expert testimony would be admissible. The statute authorizing a trial judge, in his discretion, to provide expert services, limits such services to those "necessary to ensure that the constitutional rights of the defendant are properly protected." T.C.A. § 40–14–207(b). Defendant's request for a psychologist for the purpose articulated herein wholly fails to fall within that category.

Defendant contends the trial judge erred in failing to order Martin to be brought into court for the sole purpose of allowing the jury to compare the size of Martin and defendant. The State introduced proof of the weight and height of the two men by data, a chart and photographs, one of which clearly reveals their relative sizes, taken within a few days after the murder.

Defendant's brief contains the following statement:

The defendant asserts that this evidence was extremely misleading and did not accurately portray to the jury the relative sizes of the two men.... The defendant did not wish to examine the co-defendant or do anything other than allow the jury to see the exact sizes of the co-defendants for themselves.

■ Defendant's counsel failed to inform the trial judge that it was defendant's position that the State's evidence on the relative sizes of Martin and defendant was "extremely misleading". No specifics are given in defendant's brief as to what evidence introduced by the State was inaccurate or misleading. We copy from the transcript defendant's entire presentation on this issue at the trial of this case:

MR. McALEXANDER: Your Honor, we have one additional matter we would like to take up with the court prior to the recess. Of course, the judge remembers Friday, the State introduced pictures of Ronnie Martin, Stephen West and had a drawing up on the board. We would like to move that Mr. Martin be brought up from the jail so that the jury can see for themselves what he looks like, his size or whatever they were trying to prove with their evidence on Friday. Because this is the only conclusive way for the jury to get in their minds the relative size of the two men.

THE COURT: Do you believe that to be proper in view of the fact that his counsel isn't present and that sort of thing?

MR. McALEXANDER: Your Honor, yes. I do for the simple reason that the purpose he would be brought up for is identification. It involves no constitutional rights. It involves no incrimination on his part. He is not putting himself in a position to be incriminated, not putting himself in a position to be identified by someone who is a witness in this case.

THE COURT: If either party wishes to present him for the purposes you suggest, the Court certainly would not resist that in any way, but the Court will not

participate in presenting the proof in this case and will not order anyone brought before the Court to testify or to be observed.

MR. McALEXANDER: Thank you, Your Honor.

THE COURT: To that extent, the motion is overruled. With your due exception noted, of course.

In *Bacon v. State*, 215 Tenn. 268, 385 S.W.2d 107 (1964), this Court quoted with approval from 97 C.J.S. *Witnesses* § 9 the following comment on the constitutional right to compulsory process:

> A court is not required to issue compulsory process for anyone whom accused may designate as a witness; the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible. Within these limitations the accused may obtain the attendance of any witnesses he cares to use.....

*Id.*, 385 S.W.2d at 107.

First, defendant was not denied compulsory process by the trial judge. Only his motion that the court order Martin's attendance was denied. Defendant could have subpoenaed Martin. The motion for Martin's ordered appearance was made at the end of the State's proof and before defendant put on any proof and the record indicates more than twenty-four hours expired prior to the close of the evidence and the beginning of oral argument in the case. In *Bacon*, this Court also held that a trial judge has no discretion as to whom he shall allow a defendant to subpoena and where a trial judge refuses compulsory process on the ground that the witness or witnesses have no knowledge of the facts under investigation, the burden shifts to defendant to show the nature of the testimony expected from the prospective witness. We find defendant has failed to show any violation of the right to compulsory process.

■ Defendant asserts that "the sentence imposed upon the defendant is unconstitutional because it forces the defendant to be incarcerated on death row". Defendant relies upon a federal district court case holding that the conditions on Tennessee's death row violate the Eighth Amendment's prohibition against cruel and inhuman treatment. *Groseclose v. Dutton*, 609 F.Supp. 1432 (M.D.Tenn.1985). The Sixth Circuit Court of Appeals has reversed and remanded that case and that litigation is pending in the trial court. *Groseclose v. Dutton*, 829 F.2d 581 (6th Cir.1987). Also, the unconstitutionality of conditions on death row have not been adjudged by any court to have the effect of rendering a conviction of murder and sentence of death unconstitutional. What effect a final adjudication of unconstitutional conditions on death row may have on carrying out such sentences remains to be adjudicated by the United States Supreme Court.

Defendant contends the trial judge erred in allowing Dr. Blake, a forensic pathologist to express the opinion that "the sum and total of the injuries" were inflicted by two individuals. Defendant says that opinion was outside the scope of Dr. Blake's expertise and because of his unfair prejudice violated Federal Rule of Evidence 403 which Tennessee has adopted.

■ Dr. Blake's opinion was based upon the positions of the victims bodies at the scene, the fact that Sheila Romines had been stabbed while on the bed and on the floor, the presence of torture wounds to different depths indicating two knives were used, the need to keep the two women under control during the attacks, and the absence of "fighting marks" which indicated the victims were restrained during the attack. While the conclusion that there were two individuals involved in inflicting the wounds may be on the fringe of Dr. Blake's realm of expertise, he clearly stated the reasons for his conclusions to the jury testifying to facts that were arguably within his expertise as a forensic pathologist. The factual basis for Dr. Blake's opinion was thoroughly explored on cross examination and the jury was correctly instructed on expert testimony. We are of the opinion that the jury was able to give Dr. Blake's testimony on that issue the weight that it was entitled to, without prejudice to the defendant, and that even if

technically outside Dr. Blake's expertise, the error was harmless.

■ Defendant insists the death penalty cannot be imposed upon West because Martin only received two life sentences. Martin was a juvenile when these murders were committed and under Tennessee statutes, the death penalty cannot be imposed upon juveniles. Defendant says that does not provide a rational basis for the disproportionate sentences because the proof in the light least favorable to defendant still shows Martin as culpable or more culpable than defendant. We find that the statutes prohibiting imposition of the death penalty on juveniles provides a rational basis for the disparity in sentences. *See also State v. Carter,* 714 S.W.2d 241 (Tenn.1986) and *State v. Groseclose,* 615 S.W.2d 142 (Tenn. 1981).

■ Defendant contends that the diagrams and photos introduced by the State showing the relative size of defendant and Martin were inadmissible and prejudicial. The admissibility of the photographs was beyond question. *See State v. Banks,* 564 S.W.2d 947 (Tenn.1978). Also defendant introduced a picture of Martin and defendant at the jail that is indistinguishable from the State's photos to which he objects. The admission of demonstrative exhibits is within the discretion of the trial judge. *See State v. Delk,* 692 S.W.2d 431 (Tenn. Crim.App.1985).

Defendant asserts that the trial court erred in failing to provide him with a transcript of the suppression hearing for use at the trial.

The hearing to suppress the statements given police by defendant was held on 5 February 1987, and defendant filed a motion on 25 February 1987 to be furnished a transcript of that hearing at State expense for use at trial. On 16 March 1987, the first day of trial, the trial judge denied the motion, finding no necessity for providing the transcript at that time and noting that the court reporter who would have to prepare the transcript would be engaged in reporting the trial.

■ The State must provide an indigent defendant a transcript of prior proceedings in his case when it is needed for an effective defense or appeal. *State v. Elliott,* 524 S.W.2d 473 (Tenn.1975); *Britt v. North Carolina,* 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971). The need for such transcripts varies with the circumstances of each case. Defendant says that he needed the transcript to prepare for the impeachment of the State's witnesses that testified at the suppression hearing and at the trial. The transcript of the 5 February 1987 hearing is a part of the record on this appeal. Ray Pressnell and Charles Scott, T.B.I. agents, William Breeding, a criminal investigator for Union County, and Earl Loy, Sheriff of Union County, testified at the suppression hearing and at the trial. The transcript of the suppression hearing shows that both of defendant's lawyers and the defendant were present. The testimony of the four witnesses at trial is, of course, in this record on appeal. Defendant makes no attempt to point the finger at any discrepancy between the testimony of these witnesses at the suppression hearing and at trial or to articulate how he could have used the testimony of any one of the witnesses given at the suppression hearing for impeachment purposes at trial if the transcript had been available. Defendant has the burden in this Court of showing that the transcript was needed to vindicate a legal right. *See State v. Elliott, supra.* Defendant has failed to make that showing. Our reading of both transcripts discloses that defense counsel's cross examination of those witnesses was not impaired and we failed to note any overlooked opportunities for impeachment that a transcript of the suppression hearing might have afforded. There is no merit to this issue.

We find that the evidence of defendant's guilt fully satisfies the standard prescribed in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and T.R. A.P. 13(e).

Pursuant to T.C.A. § 39–2–205 we have reviewed the sentence of death in this case and are of the opinion that it was neither

excessive nor disproportionate to the penalty imposed in similar cases.

The conviction of murder in the first degree and the sentence of death are affirmed. The death sentence will be carried out on the 8th day of May, 1989, unless stayed by appropriate authority. The other convictions are also affirmed, including grand larceny.

HARBISON, C.J., and COOPER, DROWOTA and O'BRIEN, JJ., concur.

## OPINION ON PETITION TO REHEAR

Defendant's petition to rehear presents three issues that were fully argued, considered by the Court and dealt with in the opinion. The fourth issue lists seven items that defendant classifies as errors recognized by the Court in the released opinion, and asserts that "the combination of errors ... deprived defendant of a fair trial." Some of the items were merely violations of the "better practice" rules. We have given careful consideration to defendant's contention and are of the opinion that the total errors in this record are harmless beyond a reasonable doubt.

The petition to rehear is denied.